# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

JEFF SCHUMAN,
    Plaintiff,

v.

AETNA LIFE INS. CO, *et al.,*
    Defendants.

No. 3:15-cv-1006 (SRU)

## <u>ORDER</u>

On July 1, 2015, the plaintiff, Jeff Schuman, filed a complaint against the defendants,

Ahold USA, Inc.'s Master Welfare Benefit Plan, the Administrative Committee of Ahold USA,

Inc. as Plan Administrator, and Aetna Life Insurance Company as Claims Administrator,

alleging that they violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1001, *et seq.*, by failing to provide him with all of the disability benefits to which he was

entitled. Complaint (doc. 1); Amended Complaint (doc. 32-1).[1] On May 27, 2016, the parties

filed cross-motions for summary judgment. (docs. 36 and 37) Schuman has also filed a motion

for civil penalties, alleging that the defendants violated ERISA, 29 U.S.C. § 1132(c), by failing

to disclose all policy documents in the timeframe required by the statute. (doc. 62)

For the following reasons, I **grant in part and deny in part** the defendants' motion for

summary judgment; **deny** Schuman's cross-motion for summary judgment; and **deny** Schuman's

motion for civil penalties. In addition, I **grant** the defendants' alternative request and remand the

matter for further development of the record.

---

[1] The motions discussed in this Order were filed before the amended complaint was approved; however, the amended complaint is substantially similar to the initial complaint. The main addition is several subparts to paragraph 16 describing the alleged procedural defects of the defendants' process in more detail, an issue discussed at length in the briefing around the plaintiff's motion for summary judgment.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

> fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

Unless otherwise indicated, the following facts are drawn from statements in the parties' Local Rule 56(a)(1) Statements to which the other side did not object. *See* Defs.' L.R. 56(a)(1) Stmt. (doc. 36-6); Pl.'s L.R. 56(a)(1) Stmt. (doc. 37-2).

### A.    Schuman's Disability Benefit Plan

Prior to becoming disabled, Jeff Schuman had worked as a pharmacist in retail stores for thirty-five years. At the time that he became disabled, he was employed by Ahold USA, Inc.

("Ahold") as a retail pharmacy manager at a Stop & Shop Supermarket ("Stop & Shop").[2]
Schuman's position required frequent walking, constant standing, and lifting up to 20 pounds. He
became disabled from that position on April 30, 2013, and has remained unable to perform that
job.

Schuman was eligible to participate in a long- and short-term disability plan provided as
part of a group insurance plan between Aetna Life Insurance Company ("Aetna") and Ahold. As
discussed further below, the parties adamantly disagree about which "version" of that policy
should apply here. All of the potential policies provide for six months of short term disability
("STD") benefits, followed by a period of long term disability benefits ("LTD"). All versions of
the policy then provided an initial period in which LTD benefits would be paid if the claimant
met the "own occupation" test, which awarded benefits:

> on any day that:
>
> You cannot perform the material duties of your own occupation solely
> because of an illness, injury or disabling pregnancy related condition; and
>
> Your earnings are 80% or less of your adjusted predisability earnings.

*See* Administrative Record ("AR") at 9, 102; ADD at 1454, 1484.[3]

At the end of the period in which the "own occupation" test applied, LTD benefits would
pay for an additional period if the claimant met the "reasonable occupation" test, meaning he
could not perform the material duties of any reasonable occupation "solely because of" his

---

[2] As discussed further below, the parties strenuously debate whether Schuman was an "Ahold" employee or a "Stop
& Shop" employee. The defendants have submitted Schuman's Form W-2 for 2011, which indicates that he was
employed by "S&S Credit Co., Inc.," along with an affidavit asserting that "S&S Credit Co., Inc." is the previous
corporate name of Stop & Shop and that Stop & Shop is an operating unit of Ahold. Decl. of Laura Eckert at ¶ 1, ¶
19 and Ex. H (docs. 69 and 69-9).

[3] Schuman has provided additional pages of material that were not included in the Administrative Record; however,
he has included page numbers on those documents that follow from the Administrative Record. I will refer to
Schuman's additional pages as "ADD at".

disability. *See* AR at 9, 102; ADD at 1454, 1484. A "reasonable occupation" is defined in all of the policies as:

> [a]ny gainful activity:
>
> For which you are or may reasonably become, fitted by education, training, or experience; and
>
> Which results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings.

*See* AR at 23, 119; ADD at 1471, 1499.

B.  Versions of the Certificate

Four different LTD certificates are discussed in the parties' briefing. Although the defendants object to the terminology, they have adopted Schuman's labeling of the certificates as Versions One, Two, Three, and Four. I will do the same.

The dispute over which version of the certificate applies apparently did not arise until July 2014. Prior to that date, Schuman had been informed multiple times by Aetna representatives that the "own occupation" test would only last for a twelve-month period. For instance, in a September 4, 2013 letter, Kimberly Nee, a representative of Aetna, sent Schuman a letter stating that Schuman would receive LTD benefits for twelve months under the "own occupation" test, after which time the "reasonable occupation" test would apply. AR at 815. In a September 13, 2013 letter, Nee informed Schuman that he was "eligible to receive monthly benefits effective 10/27/2013, and continuing for up to twelve months as long as you remain totally disabled from your own occupation." AR at 819. Nee also indicated on September 16, September  26, and December 12, 2013 that the "own occupation" test would be applied only for the first twelve-month period.[4] In a letter dated March 27, 2014, Nee once again informed

---

[4] Schuman largely admits that those statements were made, but denies that they accurately described his policy.

5

Schuman that his benefits under the "own occupation" test would end on October 26, 2014,

twelve months after the beginning of his LTD period. Schuman did not question or object to

Nee's repeated statements that the "own occupation" test would only apply for twelve months

until July 2014, and indeed appears to have asked several questions about the "reasonable

occupation" test in 2013. *See* AR at 203 (note on September 26, 2013 stating that "EE also asked

about RW of 60% after a year of benefits"); AR at 555 (note between July 17 and July 21, 2014

stating that "EE asked about the change in disability in Oct[ober] and how this [apparently

indicating a recent surgery] affects it").

1. *Version One, AR at 1–31*

Schuman asserts in an undated declaration submitted with his attempt to reopen his

appeal that he downloaded a copy of Version One before May 2013. AR at 1033. In a

Declaration dated February 25, 2016, Schuman asserts that he received Version One "through

my company's intranet site or by mail, before I left . . . in May 2013." ADD at 1510 (doc. No

35). Kimberly Cline, an Ahold employee, also sent Schuman a copy of Version One on July 30,

2014 in response to his request to receive a copy of his policy.

Version One states that the "own occupation" test applies for a twenty-four–month

period. AR at 9. The eligible class identified in Version One is defined as follows:

> You are in an eligible class if:
>
> You are a regular full-time active executive or salary employees [sic], as
> defined by your employer.

AR at 6. The defendants assert that Version One does not apply to Schuman because it applies

only to employees at the Carlisle unit of Ahold or Ahold Financial Services. They have not,

however, shown that Version One actually includes that limitation in its text; rather, they have

asserted that limitation in an interrogatory response. Defs' LR 56(a)(1) Stmt. at ¶ 78.

6

### 2. *Version Two, AR at 94–124*

Version Two apparently was not provided to Schuman until it was produced as part of the Administrative Record. *See* Defs.' Sum. J. Br. at 2 n.1. It includes an "own occupation" test of twelve months. AR at 102. Version Two has an effective date of January 1, 2012, and an issue date of January 11, 2012. AR at 96. It was "signed" by Mark Bertolini as CEO. *Id.* The defendants assert that Version Two is the only "version" of the Certificate that applies to Schuman. They point to the "eligible class" definition, which is as follows:

> You are in an eligible class if:
>
> You are a regular full-time Executive , salaried, Non-Union Hourly, and Union 99 Associates[sic] employed by Stop and Shop, Giant of Maryland, and American Sales Company employees [sic], as defined by your employer.

AR at 99. Schuman asserts that he was not a Stop & Shop employee, but rather an employee of Ahold, and accordingly is not a member of the eligible class.

### 3. *Version Three, ADD at 1446–76*

Schuman received Version Three in the following manner: when Cline sent Schuman Version One, which has a twenty-four–month "own occupation" test period, she also provided him with a summary plan description ("SPD") dated January 1, 2011, stating that the "own occupation" test only applied for twelve months. Schuman pointed out the inconsistency. Traci McAllen, a manager of Benefits Administration at Ahold, was notified and emailed Ronald Mattson, Aetna's Group Insurance Account Executive responsible for the Ahold account, about the inconsistency. Mattson responded on August 1, 2014, stating:

> This should absolutely read 12 months Own Occupation. It's been that way for years on the Stop & Shop / Giant of Maryland plans. I'm having the policy updated TODAY.

> We updated the policy in 2012 to make sure we had clean documents
> across the board, and someone missed this very important provision.
>
> My apologies. I have reviewed the entire document and am making
> another change to the Eligibility statement to make sure it indicates Non-
> union hourly associates.
>
> [Mattson included a copy of what appears to be the eligible class
> definition in Version One.]
>
> The Giant-Carlyle policy correctly indicates 24 months Own Occ.

ADD at 1525. Later that day, Mattson provided McAllen with Version Three. *Id.* On August 25,

2014, McAllen sent Version Three to Schuman, stating in her transmittal email that the correct

time for the "own occupation" test was twelve months. McAllen described the twenty-four

month "own occupation" period as "an administrative error." ADD at 1504.

Version Three contains the same eligible class definition as Version Two, ADD at 1451;

however, it also contains an inconsistency. It states that the "own occupation" test applies for

twenty-four months, but that the "reasonable occupation" test applies after the first twelve

months. ADD at 1454.

4. *Version Four, ADD at 1477–1503*

Schuman was provided with Version Four apparently after he identified the inconsistency

in Version Three in a call to Robert Watts, Director of Benefits at Ahold, on August 25, 2014.

ADD at 1509. Watts attached Version Four along with an email to Schuman on August 29, 2014,

stating, in relevant part:

> We understand that Aetna, the Company's LTD insurer and claims
> administrator, provided to you a Certificate that contained an administrative
> error in that it mistakenly set forth a period of 24 months for the test of
> disability. The correct time period under the LTD Plan is 12 months. I have
> enclosed a corrected Certificate [Version Four] which, as you will see,
> includes the 12-month time period.

ADD at 1509.

8

Version Four states that the "own occupation" test applies for twelve months, and after those twelve months, the "reasonable occupation" test applies. ADD at 1484. Version Four states on its cover page that it was "Prepared Exclusively for Stop and Shop / Giant of Maryland," but does not mention those entities in its eligible class definition, which is as follows:

> You are in an eligible class if:

> You are a regular full-time employee, as defined by your employer.

ADD at 1481. Version Four has an effective date of January 1, 2010, and an issue date of September 13, 2012. ADD at 1479. It was "signed" by Ronald A. Williams as CEO, but Williams ceased to hold that position in 2010.

C. Schuman's Disability Claim

On or around June 16, 2011, Schuman commenced a short term disability (STD) claim and was absent from work while he underwent surgery to address pain in his right foot. He returned to work without restrictions on January 30, 2012. On or around March 28, 2013, Schuman commenced a second STD claim and was absent from work starting on April 30, 2013 to have the hardware installed during the 2011 surgery removed. The parties agree that Schuman received the requested STD benefits, including during the period from April 30, 2013 through October 28, 2013.

The treatments did not resolve Schuman's pain, however, and Schuman's treating doctor determined that he was only capable of sedentary work. On August 29, 2013, Schuman informed an Aetna representative that he would not be able to return to his position. The parties agree that Schuman's disability has continued to render him incapable of holding that position until the present.

In September 2013,[5] close to the end of Schuman's six-month STD benefit period, his claim was referred for a determination whether he was eligible for LTD benefits. Throughout the relevant period, the parties agree that Schuman's treating physician, Dr. Aronow, consistently determined that Schuman was capable of performing sedentary work. *See, e.g.*, Defs' LR 56(a)(1) Stmt. at ¶ 30 (citing AR at 651, 827–28, 1232, 1260–61, 1299, 1314–15). The parties also agree that Schuman met the "own occupation" test of disability throughout the relevant period. The following facts thus describe Aetna's assessment of Schuman in preparation for the application of the "reasonable occupation" test.

On September 25, 2013, Joseph Thompson of Coventry Health Care provided an "Aetna Vocational Assessment" to Diane Winiarski, an Aetna employee listed as the "Claim Owner." AR at 822–25. The report indicated that Schuman had several transferable skills, but that transferability was "limited" because "his vocational background is concentrated in one specific occupation." It identified three "job goals" in occupations that would not have met Schuman's reasonable wage requirements: peer reviewer, claims examiner, and instructor-pharmaceutical.

On September 26, 2013, Winiarski completed an in-house transferrable skills assessment and identified the additional occupation of "Quality-Control Coordinator, Pharmaceuticals." AR at 499. Winiarski's notes indicate that she asked Thompson "to assess if this occupation exist [sic] in EE's locale as CT does have numerous pharmaceutical companies." *Id.* On October 18, 2013, Winiarski's notes indicate that she received an email from Thompson regarding additional labor market research. She indicated that the documentation he provided "appears to note the existence of auditor positions of a sedentary nature consistent with the educational achievement,

---

[5] The parties disagree on the exact date of this determination and the records are somewhat unclear, but pinpointing the precise date does not seem material here.

it is not known whether they would meet the reasonable wage." AR at 504. She further stated

that she had sent a follow-up email to Thompson to discuss the results because she was

> concerned that vendor may not have understood task assignment. Need labor market research to to [sic] determine if the labor market would support the alt. occ. identified in [her previous analysis], Quality Control Coordinator. Need direct ER [employer] contacts to verify the position[s] exist, hiring trends, wags [sic], and would consider the clmt for employment based on his education and work experience.

*Id.*

On November 18, 2013, Winiarski received a draft Labor Market Survey Report from

Thompson. Her notes indicate that she asked Thompson to make various edits to the report

regarding "ER [employer] contacts and typos." AR at 511. She stated that she wanted to clarify

whether Thompson had been able to reach specific employers and asked him to remove from his

report occupations that did not meet the reasonable wage requirement. She also noted that

Schuman had been apprised of the process for completing a Labor Market Survey and would be

informed that Thompson was adding additional employer contacts to the report. On November

26, 2013, Winiarski's notes indicate that Schuman was informed about the results of the final

Labor Market Survey Report and that he discussed them with her. AR at 516. Her notes indicate

that, as per policy, Schuman was not provided with a copy of the report.

On or about December 18, 2013, Schuman registered for two courses at a community

college as part of Aetna's vocational rehabilitation program. In a January 3, 2014 letter,

Kimberly Nee, a representative of Aetna, informed Schuman that he had been approved for a

Rehabilitation Program, with Lori Karickhoff serving as his vocational rehabilitation counselor.

AR at 870. In a January 2, 2014 note, Karickhoff observed that Schuman would need additional

computer training in order to be considered a qualified candidate for the alternative occupations

under consideration. AR at 537.

On June 2, 9, 10, 11, 12, 13, and July 10, 2014, Schuman informed Karickhoff that he was not qualified for or had been rejected from the positions she was sending his way. His primary concern was that many of the positions required a Pharm. D. degree, which he did not have and which would require several years of supplemental education and training at considerable expense. On June 11, 2014, Sarah Coughlin of Ability Services Network provided Karickhoff with a Labor Market Survey Report. AR at 1423–26. The report identified three additional positions that did not require a Pharm. D.

On May 30 and June 9, 2014, Schuman also told Karickhoff that he wanted to enroll in an MBA program. Karickhoff informed Schuman that he would be considered for additional schooling only if he passed the "Test Changer review," apparently meaning that he was considered to be disabled under the "reasonable occupation" test.

On October 20, 2014, Thompson prepared a Labor Market Survey Report - Transition for Winiarski. AR at 1434–44. His Transition Report purported to identify six positions within the pharmaceutical industry that were within 100 miles of Schuman's location and met his qualifications, physical limitations, and reasonable wage requirement. Those positions were: Formulary Manager at Aetna, Actuarial Assistant at Aetna, Pharmaceutical / Actuarial Manager at Aetna, Informatics Consultant at Aetna, Director Clinical Pharmacy at Aetna, and Quality Consultant at United Health Group. The report described its methodology for locating potential positions as follows: "A total of 12 contacts were made for the various management and support occupations within the Pharmaceutical industry." AR at 1444.

In an October 23, 2014 letter, apparently on the basis of Thompson's Transition Report, Nee informed Schuman that his LTD benefits would terminate on October 26, 2014 because he did not meet the Plan's "reasonable occupation" test. Nee stated that the file indicated Schuman

was capable of full-time sedentary work, and identified six positions in the pharmaceutical industry within 100 miles of Schuman's location that would pay at least 60% of his pre-disability wages. AR at 1001.

D. Schuman's First Appeal

On November 14, 2014, Schuman, through counsel, filed an appeal of the LTD denial on the grounds that: (1) he should have been evaluated under the "own occupation" definition for twenty-four months; and (2) he was also disabled under the "reasonable occupation" test during the relevant period. With respect to the latter argument, he asserted Thompson's vocational assessment was inadequate because it failed to take into account Schuman's limited experience and knowledge base.

As part of his appeal, Schuman submitted an alternative vocational assessment completed by Erin Bailey of CRC Services, LLC on November 12, 2014. AR at 1155–62. Bailey opined that Thompson had erred in concluding that Schuman could perform the six positions listed. Specifically, she observed that:

- The Formulary Manager position required formulary management experience Schuman lacked;

- The Actuarial positions required computer and actuarial experience Schuman lacked;

- The Pharmacy Quality Analyst position required computer experience and knowledge of medical benefit programs Schuman lacked;

- The Informatics Consultant position required marketing and specific technological experience Schuman lacked, and gave preference to candidates with masters degrees, which Schuman did not have;

13

- The Director of Clinical Pharmacy position gave preference to registered pharmacists (RPh) or candidates with Pharm. D., of which Schuman was neither;

- The Quality Consultant position required knowledge in federal and state Medicaid guidelines, which Schuman did not have; and

- She also noted that the employer list was narrow and dominated by Aetna.

Bailey then conducted an independent transferable skills analysis using a job matching software program cross-referenced with the Dictionary of Occupational Titles, and determined that Schuman could "presently" perform the following occupations: title examiner, claim examiner, credit counselor, policy holder information clerk, claims clerk, correspondence-review clerk, and agent contract clerk. According to the Department of Labor statistics, none of those positions would provide a "reasonable wage." Accordingly, she concluded that Schuman was disabled under the "reasonable occupation" test.

As part of Aetna's review of the appeal, on January 1, 2015, Martin Powers, an Appeal Specialist at Aetna, requested that Dr. Martin Taubman conduct an independent physician peer review. Taubman spoke with Schuman's treating physician, who again stated that Schuman would be able to perform sedentary work. Taubman submitted a report to that effect on January 13, 2015. Taubman's report also described Bailey's report, but did not substantively address her conclusions.

In a January 16, 2015 letter, Powers informed Schuman that his appeal had been denied. AR at 1024–26. The appeal denial letter relied on Taubman's peer review, although it did not identify him as the peer reviewer, along with the prior vocational assessment and its accompanying "wage survey." It did not mention Bailey's report.

E.  Schuman's Second Appeal

In a January 21, 2015 letter, Schuman requested Tabuman's peer review report and the wage survey, as well as an opportunity to respond to any previously undisclosed evidence. On January 27, 2015, Powers denied the request to reopen the appeal, but stated that Aetna would consider new information to determine if a further review was warranted.

In a May 19, 2015 letter, Schuman asserted that he had relied to his detriment on a policy provided to him by Ahold indicating that the "own occupation" test would apply for twenty-four months. In support of that argument, he submitted, *inter alia*, an undated declaration indicating that Schuman downloaded a policy with a twenty-four month "own occupation" test prior to May 2013 and that he had relied on that document when deciding whether to send his daughter to a more expensive college in "the spring of 2014." AR at 1033.

In a June 24, 2015 letter, Powers stated that Schuman had not provided the applicable plan, nor any other new information, and accordingly that he would not reopen the appeal. AR at 1077–78.

F.  Request for Plan Documents

On October 31, 2014, Schuman, through counsel, requested that Ahold provide him with, *inter alia*:[6]

> 1.      Your complete claims file, to include the complete claim file of Aetna Life Insurance Company and Ahold USA, Inc. and Stop & Shop including copies of all medical records you have already received regarding Jeff Schuman . . . ;
>
>  . . . .

---

[6] Schuman made a similar request of Aetna on November 3, 2014. AR at 1173. In response, on November 12, 2014, Nee provided a copy of the LTD Claim file, the Policy, a summary of coverage, and the Certificate Base for Schuman's claim. AR at 1013. She stated that Aetna was not the "Plan Administrator," and that Ahold should be contacted for further information.

> 3.    Your complete LTD Policy which includes amendments and appeal procedures in effect at the time Mr. Schuman became disabled;
>
> . . . .
>
> 5.    Your complete internal guidelines, rules, protocols, and criteria under which the Plan operates; including complete internal guidelines, rules, protocols, and criteria related to Mr. Schuman's diagnosis . . . .

Pl.'s Mot. For Penalties, Ex. A.

On November 13, 2014, and well within the statutorily required 30-day response period,

Robert Watts, Director of Benefits for Ahold, provided:

> 1. The Plan Document for Ahold's Master Welfare Benefit Plan (the "Group Plan"), a document that includes no disability terms;
>
> 2. "Amendment One" to the Master Plan dated January 1, 2009;
>
> 3. The Benefits Rights and Responsibilities Summary Plan Description, which does not contain LTD benefits terms;
>
> 4. The Annual Return / Report of the Benefit Plan on IRS form 5500;
>
> 5. The Long Term Disability Summary Plan Description dated January 2, 2011, which appears to be a summary of the benefits provided in Version 2; and
>
> 6. "Aetna's Long Term Disability Certificate Booklet," issued on September 13, 2012, which appears to be a copy of Version Four.

Pl.'s Mot for Penalties, Ex. B. Watts' letter further stated:

> Together the Long Term Disability SPD, the Benefits Rights and Responsibilities SPD, and the Certificate [Items 3, 5, and 6] comprise the LTD plan. Because the LTD Plan has not been amended since January 1, 2011, there have been no Summaries of Material Modifications since that time.

*Id.*

The defendants' reply brief in support of their motion for summary judgment, filed on

July 2, 2016 included an attached declaration from Ronald Mattson, Aetna's Group Insurance

Account Executive responsible for the Ahold account. (doc. 57-1) Mattson's declaration stated

16

that a "Rider" to the Plan had been inadvertently omitted from the record and that the omission

had been discovered when reviewing the file. The Rider, signed by Aetna on October 8, 2012,

substituted a single page of the Plan, entitled "Policy Contents," for an updated version. (doc. 57-

2) The omitted page appears to be a table of contents identifying the certificates associated with

the Group Plan. Mattson's declaration apparently correctly states that the new page simply

updated the dates of the certificates.

## III.    Discussion

The amended complaint in this case fails to clearly articulate separate causes of action,

but at the hearing, Schuman clarified that he is asserting: (1) a claim for benefits under section

502(a)(1)(b) of ERISA, 29 U.S.C. § 1132(a)(1)(B), on the grounds that either Version One of the

certificate applied and the "own occupation" period should have lasted for twenty-four months or

the "reasonable occupation" test was not applied correctly; (2) in the alternative, a claim for

equitable relief because of Schuman's reliance on the twenty-four–month "own occupation"

period stated in Version One.[7] In addition, Schuman asserts a claim for civil penalties under

section 502(c) of ERISA, 29 U.S.C. § 1132(c), based on Ahold's lack of timely disclosure.

### A.  Which Defendants are Subject to Which Claims

Before I address the substantive claims, I will the roles of each of the defendants and the

liability to which they may be subject as a result of those positions under ERISA. Aetna has been

identified as the "Claims Administrator." The entity known as "Ahold USA, Inc. Master Welfare

---

[7] Although the amended complaint alleges that the defendants' conduct was "a breach of their fiduciary duty as set forth by ERISA, 29 U.S.C. § 1109," Schuman's counsel stated at the hearing on these motions that he was not making a claim for breach of fiduciary duty.

Benefit Plan" appears to be "the Plan" for the purposes of ERISA, and the entity known as the "Administrative Committee of Ahold USA, Inc." appears to be the "Plan Administrator."

At the hearing, Schuman stated that he was asserting the benefits claim against "all defendants." The defendants responded that only the Plan could be held liable for a benefits claim, but stated that Aetna was nevertheless the "real party in interest" because it indemnifies the Plan. The Second Circuit has previously held that in a claim for benefits, only the plan and plan administrators may be held liable under section 1132(d)(2), which limits the enforceability of money judgments under ERISA. *See Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989). More recently, however, the Second Circuit expanded that rule to include "a claims administrator that exercises total control over the plan claims process."  *See N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015), *cert. denied sub nom. UnitedHealth Grp., Inc. v. Denbo*, 136 S. Ct. 506 (2015). As discussed below, under the Plan, Aetna has been given "sole and absolute discretion to deny benefits and makes final and binding decisions as to appeals of those denials," and accordingly is also a proper defendant to the claim for benefits. *Id.* (internal quotation marks and citations omitted); *see also Sullivan-Mestecky v. Verizon Commc'ns Inc.*, 2016 WL 3676434, at *19 (E.D.N.Y. July 7, 2016).

Schuman also stated that he was asserting his equitable claims against "all defendants." The defendants did not directly address liability because they asserted those claims had not been adequately alleged. Schuman's equitable claims are apparently asserted under section 502(a)(3), 29 U.S.C. § 1132(a)(3), ERISA's "catchall" provision for equitable relief. The Supreme Court has observed that section "makes no mention at all of which parties may be proper defendants— the focus, instead, is on redressing the 'act or practice that violates [ERISA].'" *Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 246 (2000) (quoting section

18

502(a)(3)); *see also N.Y. State Psychiatric Ass'n, Inc.*, 798 F.3d at 133 (same, and holding that a claims administrator may be liable under section 502(a)(3)). Schuman has alleged that he is entitled to equitable relief because the provision of the allegedly incorrect versions of the plan constituted a material misrepresentation upon which he reasonably relied. He has alleged both Ahold and Aetna representatives were responsible, at least in part, for providing him with incorrect versions of the plan; accordingly, I assume that both Ahold, the Plan, and Aetna, the Claims Administrator, are potential defendants for that claim.

Finally, the parties agree that Schuman has only asserted his claim for civil penalties against the Plan Administrator, which is the Administrative Committee of Ahold. *See* Pl.'s Mot. for Civil Penalties (doc. 62).

B. Claim for Benefits

Under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Schuman asserts that the defendants failed to provide him with the benefits to which he was entitled under his plan, either because they used an incorrect version of his LTD benefits certificate to apply the wrong "own occupation" test period, or because their determination that he did not meet the "reasonable occupation" test was incorrect. I address each of those arguments in turn.

1. *Which Version of the Certificate and "Own Occupation" Test Period Applies?*

Schuman asserts that Version One, which he downloaded from the intranet or received by mail from Ahold and which includes the twenty-four–month "own occupation" test period, should have applied to him. *See* Pl.'s Mot. for Sum. J. Br. at 43–49; Pl's Opp'n Br. at 4–5. The

defendants assert that Version Two, which was first provided to Schuman in the administrative record and which includes the twelve-month "own occupation" test period, applies. *See* Defs' Mot. for Sum. J. Br. at 24–27; Defs' Opp'n Br. at 32–33.

The parties principally disagree about whether Schuman falls into the eligible class for Version One or Version Two. The eligible class for Version One is defined as follows:

> You are in an eligible class if:
>
> You are a regular full-time active executive or salary employees [sic], as defined by your employer.

AR at 6. The defendants assert that class is limited to Carlisle and Financial Group employees. They have not, however, shown that Version One actually includes that limitation in its text; rather, they have asserted that limitation in an interrogatory response. *See* Defs' LR 56(a)(1) Stmt. at ¶ 78; Aetna's Answer to First Set of Interrogatories, No. 5 (doc. 36-2 at 5). Schuman only indirectly disputes that assertion by noting that the interrogatory response included an objection and therefore may be incomplete. *See* Pl.'s LR 56(a)(2) Stmt. at ¶ 78.

The eligible class for Version Two is defined as follows:

> You are in an eligible class if:
>
> You are a regular full-time Executive , salaried, Non-Union Hourly, and Union 99 Associates[sic] employed by Stop and Shop, Giant of Maryland, and American Sales Company employees [sic], as defined by your employer.

AR at 99.[8] Schuman responds that he was not a Stop & Shop employee, but rather an employee of Ahold, and accordingly is not a member of the Version Two eligible class.

---

[8] The eligible class for Version Four, which the defendants state is substantially similar to Version Two and which also includes the twelve-month "own occupation" test period, is defined as follows:

> You are in an eligible class if:
> You are a regular full-time employee, as defined by your employer.

The related questions of which employee-classes are subject to which Versions and whether Schuman was a member of the eligible class in Version Two must be answered in favor of the defendants. The defendants correctly point out that both the Version One and Version Two eligible class descriptions end with the clause "as defined by your employer," *see* AR at 6, 99. Thus, the defendants' assertion that the "salaried employees" described in Version One are only those salaried employees at Carlisle and the Ahold Financial Services unit is consistent with the language of the certificate. It is also supported by an email from Mattson, an Aetna employee, on August 1, 2014, noting that "the Giant-Carlyle policy correctly indicates [a] 24 months Own Occ." ADD at 1525. And Schuman has failed to produce affirmative evidence indicating that Version One was *not* so limited.

Ahold's assertion that Schuman was an employee of Stop & Shop for the purposes of the eligible class described in Version Two is also consistent with the language of that certificate. Ahold has submitted a declaration stating that Stop & Shop is an operating unit of Ahold.[9] *See* Mattson Decl. at ¶ 12(a) (doc. 57-1). It has also produced Schuman's 2011 W-2, which indicates that he was paid by Stop & Shop. And because Stop & Shop is a subdivision of Ahold, all of Schuman's arguments that he is an employee of "Ahold" are insufficient to establish that he cannot *also* be considered an employee of Stop & Shop for the purposes of the plan. Schuman's response that the parties have already "agreed" that he was an employee of Ahold is not

---

ADD at 1481. Version Four states on its cover page that it was "Prepared Exclusively for Stop and Shop / Giant of Maryland," and the parties appear to assume that limitation extends to the eligible class definition.

[9] Schuman's contention that Stop & Shop is actually a separate corporate entity, *see* Pl.'s Objection (doc. 63), is easily contradicted by judicially noticeable evidence, such as Ahold's SEC filings. *See, e.g.*, Royal Ahold Form 20-F, *available at* https://www.sec.gov/Archives/edgar/data/869425/000119312516490286/d147864d20f.htm (identifying Stop & Shop New England as an "operating segment" of Ahold, USA; *cf. Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)(2)).

persuasive. *See* Pl.'s Reply Br. at 7. Instead, in order to be estopped from asserting Schuman was in the Version Two eligible class, Ahold would have had to agree that Schuman was not a Stop & Shop employee, *as defined by Ahold* for the purposes of receiving his disability benefits.

The defendants' position is also supported by the almost uniform agreement between Ahold and Aetna representatives that Schuman should have been subject to a twelve-month "own occupation" test period, despite the inconsistencies in the plan documents. *See, e.g.*, AR at 192, 194, 201, 203, 555, 556, 560, 815, 819, 836, 860, 895, 975, 999; ADD at 1504, 1509. Schuman must concede that well before October 2014, the defendants had uniformly come to the conclusion that he was subject to a twelve-month "own occupation" test period and informed him of that period. Viewing the record in the light *most* favorable to Schuman, there is, at best, a small possibility that he was entitled to the twenty-four–month period, and that the defendants changed the terms that applied to him at some point in July 2014. Schuman cites to a number of Second Circuit cases rejecting attempts to orally modify the terms of a written ERISA plan. Pl.'s Reply Br. at 8. But in rejecting those employers' efforts to rely on oral promises, at least one of those cases stated that the Plan must be governed by exactly the documents provided by the defendants here—a plan document and an SPD. *See Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988) ("Congress intended that plan documents and the SPDs exclusively govern an employer's obligations under ERISA plans.").

Finally, Schuman's argument that the multiple Versions of the certificate should be read together to make up a single ambiguous contract also fails. Ahold never presented the Versions as one single contract with varying terms; even Schuman's much contested labeling of the Versions *as* versions indicates that he never thought the different certificates were intended to be

read together. And, as the defendants point out, Schuman does not argue that the terms within any given Version are themselves ambiguous.

Schuman may argue that there remains a dispute about whether Version Two or Version Four applies to him. Based on the above, however, there is no genuine dispute that the relevant Version includes a twelve-month "own occupation" test period, and the parties have not indicated that any other term of the Versions is actually material to this dispute.

### 2.   *Was the "Reasonable Occupation" Standard Correctly Applied?*

Given that there is no genuine dispute that Shuman's "own occupation" test period was twelve months, I now must evaluate the defendants' determination that Schuman did not meet the "reasonable occupation" test that applied to his claim as of October 2014.

The first step of that inquiry is to resolve the parties' dispute over the correct standard by which to review that determination. "When an ERISA plan participant challenges a denial of benefits, the proper standard of review is *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority' to assess a participant's eligibility." *Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 658 (2d Cir. 2013), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). "If the plan does reserve discretion, the denial is subject to arbitrary and capricious review and will be overturned only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* (internal quotation marks and citation omitted). Schuman points out, however, that in *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), the Second Circuit held the denial of a claim under a plan including discretionary authority is *not* entitled to the great deference afforded by the arbitrary and capricious standard if the denial procedure failed to comply with the Department of Labor's

claims-procedure regulation. *Id.* at 56. The *Halo* Court further stated that "the plan bears the burden of proof on this issue since the party claiming deferential review should prove the predicate that justifies it." *Id.* (internal quotation marks and citation omitted). As applied to the present case, the plan bears the burden to show that the denial decision was made using compliant procedures, because compliance is "the predicate that justifies" deference through arbitrary and capricious review.

Thus, in order to evaluate whether Aetna's claim denial was appropriate, I must first determine whether there is any genuine dispute over whether the Plan has a discretionary clause. I find that there is not, and accordingly, arbitrary and capricious review would apply if the proper procedures were used. Next, I must consider whether the defendants have satisfied their burden to show that they substantially complied with the claims-procedure regulation, such that arbitrary and capricious deference is appropriate. I find that they have not been able to do so on the Administrative Record, because Schuman has identified specific evidence to the contrary. Although those determinations would give me good cause to reopen discovery beyond the Administrative Record, *see Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 97 (2d Cir. 2003), however, I find that ambiguities in the proper application of the "reasonable occupation" standard weigh in favor of a remand.

a.  Does the Plan have a discretionary clause?

The defendants assert that Schuman's policy explicitly designates Aetna, the Claims Administrator, as the Plan's fiduciary and grants it discretionary authority. Defs' Mot. for. Sum. J. Br. at 18. The defendants cite to a document entitled "Group Accident and Health Insurance Policy" (the "Group Policy"), the cover page of which states that it was "entered into by and

between Aetna Life Insurance Company . . . and Ahold U.S.A., Inc." AR at 54. That document

contains a provision stating, in relevant part:

> For the purpose of section 503 of Title 1 of the Employee Retirement
> Income Security Act of 1974, as amended (ERISA), We [Aetna] are a
> fiduciary with complete authority to review all denied claims for benefits
> under this Policy. . . . In exercising such fiduciary responsibility, *We shall
> have discretionary authority* to determine whether and to what extent
> eligible employees and beneficiaries are entitled to benefits and to
> construe any disputed or doubtful terms under this Policy, the Certificate
> or any other document incorporated herein. We shall be deemed to have
> properly exercised such authority unless We abuse our discretion by acting
> arbitrarily and capriciously.

AR at 78 (emphasis added).

Schuman responded in his opposition brief that the Group Policy is not the same

document as the disability plan at issue in this case, as demonstrated by the fact that the language

included above was not included in any of the Versions of the certificate. The defendants then

provided a declaration from Ronald Mattson, a Group Insurance Account Executive at Aetna

who acted as a liaison between Aetna and Ahold. Defs' Reply Br., Mattson Declaration

[hereinafter, the "Mattson Decl."].[10] Mattson explained that the Plan consists of two parts: (1) the

Group Policy containing general terms that apply to all of the different coverage options; and (2)

certificates setting out the specific slate of benefits for each class. Mattson Decl. at ¶¶ 3, 5. He

stated that the Group Policy incorporates the certificates by reference to a "Schedule of Benefits"

itemized on its "Policy Contents" page. *Id.* at ¶¶ 4, 5. And because the Group Policy and

---

[10] Schuman has objected to the Mattson Declaration on the grounds that it was not made on personal knowledge and
was not introduced with the permission of the court, and is thus an impermissible supplement to the Administrative
Record. Pl.'s Objection (doc. 63). In light of my liberal permission to Schuman to introduce documents outside of
the Administrative Record, those arguments are unconvincing; moreover, the declaration does not introduce a *new*
matter for the first time, but rather seeks to clarify an issue that, I suspect, the defendants simply did not anticipate
being an argument. Accordingly, Schuman's objection is overruled.

certificates are intended to be part of the same document, the latter would not repeat, for instance, a grant of discretionary authority included in the former. *Id.* at ¶ 5.

As discussed further with respect to Schuman's motion for civil penalties, Mattson then disclosed that, in the course of preparing the declaration, Aetna noticed that the "Policy Contents" page of the Group Policy previously produced in the Administrative Record at 59 had dates inconsistent with the version of the certificate to which it referred, and thereby discovered that Aetna and/or Ahold had failed to disclose a Rider with an updated version of that page that had been issued in 2012.[11] *Id.* at ¶ 10. The updated Policy Contents page cites to SOB1B, an abbreviated reference to Schedule of Benefits 1B, which applies to Full-Time active Stop & Shop, Giant of Maryland and American Sales Salary Employees (i.e., Version Two). *Id.* at Ex. A; AR at 32–34.

Mattson's explanation of the relationship between the Group Policy and the certificates is supported by language in each. Mattson points out that Version Two states that it is "part of the Group Insurance Policy" between Aetna and Ahold and that "the Group Insurance Policy determines the terms and conditions of coverage." *Id.* at 9 (citing AR at 96). Version One includes the same language. AR at 3. In the same vein, the Group Policy cover page indicates that:

> Your Group Policy consists of:
>
> a policy "shell" containing general provisions relating to policyholder/insurance company matters, and
>
> a certificate (including the Schedule of Benefits) containing the complete plan of benefits.

---

[11] Schuman objects to the late disclosure of the new Policy Contents page, but does not dispute its authenticity. Accordingly, I assume that the new Policy Contents page is accurate.

AR at 37.

Based on the above account and a review of the documents, I conclude that the Group Policy contains an adequate grant of discretion, and the Group Policy documents as well as *both* Versions of the certificate match Mattson's explanation that the Group Policy, acting as a "wrap," contains the general terms for all coverage.[12] Accordingly, I hold that the Plan granted Aetna discretionary authority.

   b.   Were appropriate procedures followed such that deference is appropriate?

Despite the grant of discretionary authority, however, Schuman has identified several alleged violations of the claims-procedure regulations that he claims are sufficient to trigger *Halo*'s *de novo* standard of review. *See* Pl.'s Mot for Sum. J. Br. at 31–38; Defs' Opp'n Br. at 9–16. The defendants did not explicitly cross-move for summary judgment on the procedural violations issue, but they have sought a summary judgment determination that the arbitrary and

---

[12] Schuman has attempted to create additional factual disputes regarding whether the Group Policy actually relates to the certificates. First, he asserts that the Group Policy is an "obviously false document" because it bears the signature of Ronald Williams as CEO of Aetna but it is dated to a time when Williams did not hold that position. Pl.'s Opp'n Br. at 3. Mattson, however, has provided the extremely plausible explanation that the signature was an electronic facsimile, added by harmless accident. Mattson Decl. at ¶ 8. And Schuman has adduced no affirmative evidence, beyond the signature itself, that the Group Policy document was fraudulent. Although in ERISA cases, discovery is generally limited to the administrative record to avoid getting at the substantive merits of the claim decision, Schuman would certainly have been entitled to discovery regarding the authenticity of the governing documents, *see Burgie v. Euro Brokers, Inc.*, 482 F. Supp. 2d 302, 309 n.12 (E.D.N.Y. 2007)—the fact that he apparently either did not seek any such discovery or uncover any favorable evidence undermines the sincerity of his position.

   Second, Schuman argues that those pages are, in fact, part of Version One. Pl.'s Objection at 3 (doc. 63). The defendants point out that the table of contents of Version One indicates that the last included section of that document is the Glossary, which ends on page 31 of the Administrative Record. *See* AR at 2. Moreover, the Schedule of Benefits states that it is "For: Full-time active employees of Stop and Shop . . . who are eligible for Long term Disability Benefits," AR at 32, and, as discussed at length above, the parties apparently agree that Version One does not apply to that group.

   Third, he argues that because the Group Policy was provided as part of a fax from a claims analyst at the Premium Waiver Unit, "the references in the group policy to LTD premiums can relate to the LTD premium for waiver of premium disability coverage." Pl.'s Objection at 4 (doc. 63). But that position does not appear to be supported by the language of the documents themselves—for instance, the first page of the Group Policy states that it includes "a certificate . . . containing the complete plan of benefits," AR at 37, rather than a more limited discussion of premium waivers. Schuman has not pointed to any evidence that would justify looking beyond the plain language of the documents here.

capricious standard should apply as a matter of law, which would implicitly require a finding that the *Halo* exception does not apply.

Schuman has raised several genuine issues regarding whether his claims determination was decided in a manner consistent with the claims-procedure regulations. As noted above, in *Halo*, the Second Circuit rejected the "substantial compliance" doctrine, warning that "deviations [from the regulation] should not be tolerated lightly." *Id.* at 57. Violations of the claims procedure regulation should result in *de novo* review in federal court "unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." [13] 819 F.3d at 58. The defendants conceded at the hearing that they have made no arguments about the first element of the *Halo* test, namely, whether those violations were inadvertent. And at least one of the enumerated violations, a complete failure to consider documents submitted on appeal, cannot be written off as harmless because a consideration of those documents could plausibly have changed the outcome of the appeal. I am mindful, however, that the present motions for summary judgment are made on a record that has

---

[13] The defendants assert that *Halo* must be read narrowly to avoid conflicting with *Conkright v. Frommert*, 559 U.S. 506 (2010), which held that a plan administrator's decision should be given deference unless it was shown that he "had acted in bad faith or would not fairly exercise his discretion" under the plan. *Id.* at 515. Applying that standard, the Court held that an administrator who had committed "a single honest mistake" should not be stripped of deference. *Id.* at 513. But *Conkright* does not appear to conflict with the *Halo* decision—the latter addresses errors resulting from procedural defects, rather than one-off mistakes. Moreover, although *Halo* asserts that the Department of Labor regulation rejected a "good faith" standard of compliance as well as the "substantial compliance" doctrine, *Halo*, 819 F.3d at 57, the decision nevertheless preserves an inadvertent / harmless error exception that seems to be consistent with *Conkright*'s holding, *id.* at 57–58.

    I also note that the defendants misstate the *Conkright* holding when they assert that it requires deference to plan administrators "only when a court can conclude that he 'is too incompetent to exercise his discretion fairly.'" Defs' Opp'n Br. at 17 (quoting *Conkright*, 559 U.S. at 521). That statement is actually used by the Court as an example of "extreme circumstances" that would not be given deference, rather than setting out the *requirements* for the boundaries of deference.

thus far largely been limited to the Administrative Record. The violations suggested by that Record would be helpfully elucidated by traditional discovery or, as I discuss below, a remand.

Below I discuss Schuman's strongest arguments that violations have occurred. Because those violations are more than sufficient to trigger *Halo*, in the interest of some brevity, I do not reach Schuman's remaining arguments.

      i.   <u>Failure to Consider the Bailey Report – Failure to take into account all documents on appeal, 29 C.F.R. § 2560.503-1(h)(3)(iv), and appeal review improperly deferential to initial determination, 29 C.F.R. § 2560.503-1(h)(3)(ii)</u>

The most serious plausible procedural violation Schuman asserts is that Aetna failed to consider the additional vocational assessment that he submitted on review (the "Bailey Report").

Section (h)(3)(iv), which applies to disability benefit plans through section (h)(4), states that a plan's claims procedures "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless" they "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."

Schuman argues that Powers, Aetna's Appeals Specialist on Schuman's claim, failed to evaluate any of the documents submitted by Schuman with his appeal. The defendants point out that Taubman's peer review report, on which Powers relied, both reviewed and discussed Bailey's report and Schuman's additional medical evidence. *See* AR at 1081, 1084 (describing, but not analyzing Bailey's report). The peer reviewer is a podiatrist, however, and it is clear that his review was intended to evaluate the medical evidence of Schuman's disability, as opposed to prior assessments of his transferrable skills and specific employment prospects. Accordingly, it

would be wholly unreasonable for the appellate reviewer to rely on Taubman's assessment of Bailey's report in order to determine whether its critique of the initial vocational assessment was valid.

The defendants further argue that Schuman has not provided any affirmative evidence that Powers did not independently analyze Bailey's report. But the defendants, and not Schuman, bear the burden to show that their determination is consistent with the claims procedures regulations, and they have not proffered any affirmative evidence that the appellate reviewer *did* consider Bailey's report. Accordingly, Schuman has raised a genuine issue of material fact regarding consideration of the Bailey Report.

Schuman also argues that Aetna's failure to consider the Bailey report in making its appeal decision constitutes an improper deferral to the initial decision, in violation of section (h)(3)(ii). Section (h)(3)(ii), which applies to disability benefit plans through section (h)(4), states that the claims procedures for group health plans "will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless" they "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual."

 Section (h)(3)(ii) is not much litigated. An Eastern District of California judge found that the section was violated when an appellate reviewer "simply copied down" four paragraphs from obviously flawed medical reports as the basis of its conclusion. *Faulkner v. Hartford Life & Acc. Ins. Co.*, 860 F. Supp. 2d 1127, 1143 (E.D. Cal. 2012). A Fifth Circuit panel held that the section was violated when an appellate reviewer relied exclusively on the opinion of the same doctor

who provided the basis for the initial review. *Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009). Neither of those cases is squarely on point—the initial vocational assessment was not obviously flawed or glaringly inconsistent with the record, like the severely criticized reports in *Faulkner*; and Powers here obtained a peer review of the initial doctor's medical opinion, the accuracy of which Schuman does not meaningfully contest. Nevertheless, that the appeal denial letter wholly fails to address any concerns about the accuracy of Thompson's report is concerning, and the defendants have not proffered any evidence that silence was not the result of improper deference to the initial determination.

        ii.   <u>Failure to furnish internal guidelines, 29 C.F.R. §§ 2560.503-1(h)(2)(iii) and (m)(8)(iv)</u>

Schuman argues that Aetna also violated the claims-procedure regulation requiring the disclosure of relevant documents when it failed to provide him with copies of internal policy guidelines on request.

Section (h)(2)(iii) requires that there be a procedure to make "relevant documents" available to the claimant on appeal. Schuman asserts that Aetna's internal policy guidelines are relevant documents under section (m)(8)(iv). That provision appears to apply to guidelines describing how the plan handles claims based on particular diagnoses, rather than the general guidelines for handling claims. Section (m)(8)(iii) offers a more applicable category of "relevant documents," however, including any document that "[d]emonstrates compliance with the administrative process and safeguards required pursuant to paragraph (b)(5)," which in turn requires that the claims procedures ensure that plan provisions are applied in a consistent manner.

The internal guidelines at issue here are clearly relevant to a consideration of whether the claims procedure was applied consistently—although the plan granted Aetna discretionary

authority, when it chose to codify internal guidelines, it established a set of norms against which Schuman was entitled to compare the handling of his own case. *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 124 (1st Cir. 2004) (coming to a similar conclusion when considering section (m)(8)(iv) in the context of a discovery motion). The parties seem to agree that Schuman requested internal policy guidelines from Aetna on November 2, 2014, and that those guidelines were not produced during his appeal, but instead were provided to Schuman for the first time as part of discovery in this case. *See* Defs.' Opp'n Br. at 11–12 (citing Lori A. Medley Decl.). Accordingly, Schuman has raised a genuine dispute of fact on this issue.

### iii.  Failure to set up administrative processes, 29 C.F.R. § 2560.503-1(b)(5)

Section (b)(5) requires the claim procedures to include administrative processes ensuring that similarly situated claimants are treated in a consistent manner, including "safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents." Schuman argues that the defendants' inability to even identify, let alone provide, the correct version of his certificate demonstrates that those safeguards were not in place.

The Administrative Record in this case does not inspire confidence. As discussed above, Schuman's first documented request for his certificate occurred in late July 2014. Thereafter, from July 30, 2014 through August 29, 2014, the defendants struggled to provide Schuman with *any* certificate including what they believed to be the correct "own occupation" test period. The briefing in this case has revealed further omissions.

In response, the defendants simply reiterate their argument that Schuman's claim determination was correctly decided under Version Two. But an argument that the claim was actually decided pursuant to the correct policy in *this* case does not address whether the

safeguards required by section (b)(5) to ensure that outcome in *every* case were actually in place. It seems difficult for the defendants to claim that they have adequate safeguards in place to ensure claims determinations are made in accordance with governing documents when they do not even seem to have a mechanism to consistently identify what those documents are. Accordingly, Schuman has adequately supported a claim that this section was violated.

### iv.  Failure to identify experts, 29 C.F.R. § 2560.503-1(h)(3)(iv)

Finally, the defendants admit they did not fully comply with section (h)(3)(iv), when they failed to identify Thompson[14] as a vocational expert at any time during the initial determination or appeal. Defs' Opp'n Br. at 13. Section (h)(3)(iv) states that a group health plan's claim procedures must "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination."

The defendants' concession may be incorrect. Section (h)(3)(iv) does not state that claimants must be provided with the identity of experts on request, but instead simply requires the claim procedures to "provide" that information. Accordingly, "[m]any district courts have concluded that a plan with procedures that 'provide [ ] for' the identification of these experts upon request satisfies the regulation; the regulations do not require explicit disclosure of those experts in the denial letter." *Bible v. Parker Hannifin Corp. Ben. Fund*, 2015 WL 3756435, at *1 (E.D. Tenn. June 16, 2015) (collecting cases); *see also Parkridge Med. Ctr., Inc. v. CPC Logistics, Inc. Grp. Ben. Plan*, 2013 WL 3976621, at *15 (E.D. Tenn. Aug. 2, 2013) (finding no violation of section (h)(3)(iv) where the plaintiff failed to request the experts' identities). In the

---

[14] Schuman describes the improperly unidentified individual as the "vocational reviewer," and the defendants do not specify the individual, but they do refer to Thompson's Labor Market Survey Report, so I assume Thompson is the individual in question.

present case, Schuman has not indicated that he specifically requested identification of any experts during the pendency of his claim and appeal. Although the defendants concede that, in contrast to the cases discussed above, Aetna's policy would have prohibited disclosure of the specific document, Defs' Opp'n Br. at 13, neither party discusses whether that policy also would have prohibited the disclosure of Thompson's identity.

     v. <u>The Need for Remand</u>

   Together, the violations discussed above are sufficient under *Halo* to trigger *de novo* review of the defendants' determination that Schuman did not meet the "reasonable occupation" test. But additional ambiguities in the Administrative Record cloud the viability of that review. To be sure, many of the issues raised above would benefit from discovery outside of that Record.

   More importantly, however, it is unclear from the Administrative Record whether either party presented sufficient evidence during the initial claim review and appeal process to determine whether Schuman meets "reasonable occupation" standard. Aetna's vocational experts appear to have assumed—perhaps overly generously—that a "reasonable occupation" means one that would fit easily into Schuman's resume, and accordingly focused on specific *positions* in the pharmaceutical industry in Connecticut, rather than considering more generally whether Schuman was, or could reasonably become fitted for, *occupations* in the economy. Bailey, Schuman's expert, correctly began with a consideration of general occupations as described by the Dictionary of Occupational Titles, but does not seem to have given serious consideration to the "become reasonably fitted" portion of the reasonable occupation standard. And then Aetna compounded the problem by failing to adequately consider Bailey's report on review.

   The proper approach lies somewhere between those taken by the two sides—an appropriate evaluation will consider *both* whether Schuman is or may become fitted to perform

any type of work that actually exists in the economy *and* whether he is "vocationally qualified to obtain such employment, and to earn a reasonably substantial income from it." *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 215 (2d Cir. 2006); *see also Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 136 (2d Cir. 2010) (applying the same holding); *Smith v. Champion Int'l Corp.*, 573 F. Supp. 2d 599, 618–55 (D. Conn. 2008) (providing an exhaustive discussion of how to conduct appropriate vocational and transferrable skills analyses).   Without such an evaluation, however, in order to make a proper determination I would be required to consider significant evidence outside of the Administrative Record and, in a meaningful sense, to become the decisionmaker in the first instance rather than a reviewer of the decisions made by the Claims Administrator. Accordingly, remand is appropriate to supplement the Administrative Record with information necessary to permit Aetna to make an appropriate evaluation of Schuman's LTD claim. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("[N]othing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators.") (internal quotation marks and citation omitted).

c.   Conflict of Interest

Schuman's complaint and briefing also suggest an argument that Aetna has a conflict of interest as the party that both evaluates claims and indemnifies the Plan for any payments made on those claims, and accordingly Aetna's decision-making should be entitled to less deference. *See* Pl.'s Mot. for Sum. J. Br. at 39–43; Defs' Opp'n Br. at 20–29. The Supreme Court, in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), held that similar circumstances created a potential conflict of interest that should "'be weighed as a factor in determining whether there is abuse of discretion.'" *Id.* at 115 (quoting *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989)). The *Glenn* Court instructed lower courts to consider, *inter alia*, whether the administrator had "a history of biased claims administration" or whether it had, instead, "taken active steps to reduce potential bias and to promote accuracy." *Id.* at 117.

The defendants point out that only limited discovery has been taken on the details of a potential conflict. *See* Defs' Opp'n Br. at 21. Schuman has alleged both structural conflicts and specific facts in his case that, read most favorably to him, could suggest interference on the basis of a conflict; moreover, some of the facts underlying his conflict claim will also be assessed as part of the *de novo* review of his claim determination. Given that I have already found good cause to remand this case in order to resolve the issues discussed above, however, the need for additional discovery on the question of conflict can be addressed if and when the case returns to this court.

C. Equitable Claims

Schuman also argues for various equitable remedies based on his "reasonable reliance" on the twenty-four–month period. *See* Am. Compl. at ¶ 16(i) ("Defendants misrepresented the length of the "own occ" period in violation of 29 U.S.C. § 1132(a)(3)."). In his motion for summary judgment, Schuman describes his claim for equitable relief as seeking a remedy equivalent to estoppel under section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). *See* Pl.'s Mot. for Sum. J. Br. at 54.

"To prevail on an estoppel claim under ERISA, [a plaintiff] must prove (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and must adduce facts sufficient to satisfy an 'extraordinary circumstances' requirement as well." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The defendants correctly argue that Schuman cannot show reasonable reliance as a matter of law. Schuman's only evidence of his reliance appears to be his two declarations. *See* Schuman Decl. 1 (AR at 1033, undated but submitted on May 19, 2015); Schuman Decl. 2 (ADD at 1510, dated February 25, 2016). In his first declaration, Schuman states that he downloaded Version One in May 2013 and relied on the twenty-four–month "own occupation" test period in "the spring of 2014" when deciding whether to send his daughter to a more expensive college. AR at 1033. His second declaration adds that he either downloaded Version One *or* received it by mail from Ahold in May 2013. ADD at 1510.

The defendants point out, however, that between May 2013 and "the spring of 2014," Schuman was told multiple times that his benefits test would change after twelve months. Schuman did not question or object to any of those statements; indeed, the record suggests Schuman asked several questions about the "reasonable occupation" test in 2013 that reflected an awareness of the twelve-month time period. *See* AR at 203 (telephone note on September 26, 2013 stating that "EE also asked about RW of 60% after a year of benefits"); AR at 555 (note between July 17 and July 21, 2014 stating that "EE asked about the change in disability in Oct and how this [apparently indicating a recent surgery] affects it"). There is thus no reasonable dispute that Schuman was at least on inquiry notice, if not actual notice, as of "the spring of 2014" that a twelve-month "own occupation" test period would apply.

Similarly, Schuman cannot show the requisite "extraordinary circumstances." In order to satisfy that requirement, a plaintiff "must show that the employer used the promise to 'intentionally induce [a] particular behavior' on the plaintiff's part only to renege on that promise after inducing the sought after behavior." *Peterson v. Windham Cmty. Mem'l Hosp., Inc.*, 803 F. Supp. 2d 96, 105 (D. Conn. 2011) (quoting *Devlin v. Transp. Commc'n Int'l Union,* 173 F.3d 94,

102 (2d Cir. 1999)). Although Schuman apparently recognizes that such circumstances must involve inducement, *see* Pl.'s Opp'n Br. at 13, he makes no effort to argue that any of the defendants had any intent to induce him to do anything by misrepresenting the length of his "own occupation" test period. There is certainly no plausible argument that the defendants somehow intended the action that Schuman claims he took as a result of his reliance—namely, deciding to send his daughter to a more expensive college.

The bulk of Schuman's responsive argument goes to establishing that he can properly assert an equitable claim within the ERISA framework. Assuming, *arguendo*, that he can, he has nevertheless failed to identify any ground for equitable relief that does not require a showing of reasonable reliance. Accordingly, I hold that Schuman did not reasonably rely on a twenty-four–month "own occupation" test period, and therefore grant the defendants' motion for summary judgment on Schuman's equitable claims.

### D.  Motion for Civil Penalties

Schuman also moves for civil penalties against the Administrative Committee of Ahold, as Plan Administrator, under ERISA. He argues by omitting the updated Rider that was disclosed for the first time in the Mattson Declaration, the Administrative Committee failed to provide requested Plan materials on the timeline required by the statute. The Committee, asserting that the motion is frivolous, seeks costs.

Section 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), requires that:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

ERISA's civil enforcement provision further provides that any administrator who fails to comply with a request for information required to be disclosed under the statute within 30 days of that request "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to \$[110] a day from the date of such failure." 29 U.S.C. § 1132(c)(1)(B) and 29 C.F.R. § 2575.502c-1(increasing potential penalty amount to \$110). As noted above, the parties agree that the Administrative Committee is the Plan Administrator. They also seem to agree that ERISA at least arguably required the disclosure of the Rider and updated "Policy Contents" page, presumably as an "instrument under which the plan is operated"[15] under section 104(b)(4).

"In assessing a claim for statutory penalties under ERISA, a district court should consider various factors, including [1] bad faith or intentional conduct on the part of the administrator, [2] the length of the delay, [3] the number of requests made and documents withheld, and [4] the existence of any prejudice to the participant or beneficiary." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 848 (2d Cir. 2013) (internal quotation marks and citation omitted).  Schuman asserts that each of those factors weighs in favor of awarding penalties in the present case. Schuman is correct that the length of the delay in providing the correct document is significant, at 19 months, and that the Administrative Committee had numerous opportunities to find the omitted document and provide it to Schuman. The remaining factors, however, do not support the imposition of sanctions.

---

[15] There is at least a colorable argument that the Rider and new "Policy Contents" page, which make only a technical change to the Plan, do not constitute an "instrument" within the meaning of the statute. *See Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142–44 (2d Cir. 1997) (observing that both the plain meaning of the word "instrument" and the legislative history of the statute suggest that ERISA's disclosure requirements were intended to provide beneficiaries with the governing legal documents that affected their ability to obtain their benefits, rather than granting an unlimited entitlement to "technical" documents). I need not decide that issue here, however, because the same concerns are adequately addressed by the prejudice inquiry.

Schuman asserts that bad faith is shown by the Committee's persistent inability to provide Schuman with the applicable plan documents. Pl.'s Mot. at 3. But this motion for civil penalties is tied to a specific omission—it is not an alternative vehicle by which to punish Ahold for the substance of the complaint. Schuman has offered no evidence that the Administrative Committee was aware of the omitted Rider and was intentionally keeping it from him, or that it was intentionally failing to conduct an appropriate search of its documents. Although the Committee's difficulty in providing a complete and accurate copy of Schuman's plan is concerning, the evidence in the record suggests incompetence, rather than bad faith or intentional conduct, drove both the specific omission here and the Committee's inability to provide proper plan documents more generally.

Schuman argues that Watts' assertion that the Plan "had not been amended since January 1, 2011" was false or misleading. The Committee has a convincing rejoinder. It points out that the contested statement reads in full:

> Because the LTD Plan has not been amended since January 1, 2011, there have been no Summaries of Material Modifications since that time.

A "Summary of Material Modifications" ("SMM") is defined in the SPD as "an amendment that changes the terms described in this SPD." Eckert Decl., Ex. E at 24. The Committee asserts that SMMs are intended to put employees on notice only of *material changes*, rather than superficial ones such as the change at issue here. Accordingly, it argues that Watts' letter should be understood as correctly stating that there had not been any *material* modifications to the LTD Plan since June 1, 2011. I agree.

Finally, the Committee argues that Schuman has failed to show any prejudice resulting from the omitted Rider and new "Policy Contents" page. Ahold Opp'n Br. at 4. Schuman had no need to rely on the Policy Contents page that he received, and it is unclear how or why such a

technical change would have changed Schuman's discovery strategy in any way. Accordingly, even assuming *arguendo* that the failure to produce the Rider and updated "Policy Contents" page was a violation of ERISA's disclosure requirements, that violation would not justify the imposition of penalties against the Committee.

I also deny the Committee's motion for costs—although the omission was minor, it was a problem of the Committee's own making.

### IV.   Conclusion

The defendants' motion for summary judgment is **granted in part** with respect to Schuman's equitable claims **and denied in part**, insofar as they have not shown that there is no genuine dispute of material fact regarding either the appropriate standard of review for the claims determination or whether the determination should be affirmed under any standard. Schuman's cross-motion for summary judgment is also **denied**. Schuman's motion for civil penalties is **denied**, and the Administrative Committee's motion for costs in defending that motion is also **denied**.

Because the Administrative Record does not provide me with sufficient evidence to determine whether the "reasonable occupation" standard has been correctly applied, however, I **grant** the defendants' request for remand for further consideration of that issue.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of March 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge